Where plaintiffs installed a power plant for defendant under express
warranty as to fuel economy in its use, etc., defendant could keep and
use the plant with knowledge of its defects, and rely upon the warranty
for protection.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 43, Sales, § 1227.]

2. SAME.

In an action for the price of a power plant, damages for a breach of
warranty as to fuel economy in its use, etc., were properly pleaded as a
counterclaim.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 43, Sales, § 1214.]

3. SAME—DAMAGES—MEASURE.

The measure of the purchaser's damages on a breach of warranty by
the seller of a power plant is the difference between the value of the
plant if it had been as warranted and the actual value as it was at the
time of delivery.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 43, Sales, § 1285.]

4. SAME.

It is improper to allow the buyer of a power plant, on a breach of war-
ranty by the seller, a sufficient amount of damages to make a perfect
plant as called for by the contract, and at the same time award another
amount because the plant is imperfect, when many of the same items are
included in each amount.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 43, Sales, §§ 1285–
1290.]

5. SAME.

Where engines, etc., to be installed in the buyer's electric light plant
do not fill the seller's warranty, the buyer is not entitled to an item for
the enlargement of its buildings in putting the plant in condition to fulfill
the contract.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 43, Sales, § 1290.]

6. SAME.

On breach of warranty by the seller of a power plant as to fuel economy
in its use, the buyer is not entitled to damages on account of the seller
adding 40 feet to the length of the smokestack, where it was done at their
own expense, in good faith, and with the buyer's consent to increase the
efficiency of the plant.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 43, Sales, § 1290.]

7. SAME—CONSTRUCTION OF WARRANTY.

A warranty that stationary engines will develop rated horse power
on a fixed fuel consumption is not a warranty of the fuel economy of the
engines when carrying any less load than required to develop their rated
horse power; it appearing that such engines will not run with the same
fuel economy at an under load as at the rated load.

Appeal from Order Entered on Report of Referee.

Consolidated actions between Leonard Ames and others and the

Norwich Light Company. From a judgment upon a referee's decision,. and an order denying a motion to set aside the referee's report, Ames and others appeal. Order affirmed, judgment reversed, referee discharged, and new trial granted.

Appeal by Leonard Ames, Arthur L. Merriam, Leonard Ames, Jr., and Allen Ames, from a judgment of the Supreme Court, entered in the clerk's office of the county of Chenango, on the 30th day of June, 1902, upon the decision of a referee; also from an order entered in said clerk's office on the 23d day of May, 1902, denying a motion to set aside the referee's report. The appellants entered into a contract April 30, 1894, with the respondent, the Norwich Light Company for the erection and installation of two engines of 115 horse power each, two tubular boilers, a water heater and a pump, and the necessary appurtenances therefor in the electric light plant of such company at Norwich, N. Y., for an agreed price of $5,621, payable $2,000 on arrival of machinery at Norwich, and the balance at end of 30 days' run. The contract contained a guaranty that the "engines shall develop rated horse power on a fuel consumption, not exceeding three lbs. of good anthracite coal (clean chestnut) per I. H. P. per hour this to be determined by a test covering one day's run." The complete plant was also guaranteed against defects in material for a period of one year. The specifications for engines attached to the contract contained this further provision: "Economy. That the efficiency and fuel economy shall be the best obtainable for engines of this type and horse power capacity, and that this high grade of economy and efficiency shall be maintained through a much longer period of time than is possible with any form of piston valve engines." The appellants manufactured and set up in the respondent's plant the materials mentioned in the contract, and put the plant in operation on or about the 15th day of November, 1894, and thereafter ran the same under the direction of their employé for a period of 30 days, which period expired on the 15th day of December, 1894. On the arrival of the material at Norwich, the respondent paid the appellants $2,000 on account of the contract. The appellants never made any test of the plant covering one day's run, as provided in the contract. They undertook to make a test for fuel economy on December 6, 1894, and discovered that, as the plant was in a valley, the 60 foot smokestack mentioned in their specifications was not high enough to make a sufficient draught to burn the fuel effectually. They then lengthened the stack to the height of 100 feet. After that, and on December 13, 1894, they made a test which was continued six hours, in the presence of one Wheeler, who was an employé of the respondent, and whom the appellants claim was acting for the respondent as superintendent of this test with full authority in regard thereto. After six hours Wheeler expressed himself as satisfied with the test, and it was discontinued. The referee has found that Wheeler had no authority under his employment to bind the respondent with respect to this test. After this test was made the appellants demanded the balance of their pay, claiming the full completion of their contract. The respondent refused to pay, and within a few days served a summons in an action brought by it against the appellants. No complaint was served with this summons, and it was not served until March 3. 1895. In it damages were claimed for alleged breach of contract. In June, 1895, the appellants commenced an action against the respondent to recover the amount unpaid upon the contract. Answers were interposed in each of these actions. The light company's answer contained a counterclaim for $5,000 damages for breach of warranty with respect to fuel economy and for $5,000 damages for defective work. After the commencement of these actions. the respondent employed an expert, who about December 1, 1895, made a test of the plant of a day's run, and he testified upon the trial that upon such test the consumption of coal was 3.87 pounds per indicated horse power per hour. ·

The two actions above mentioned· were consolidated by order of the court, and they were tried as one before a referee who gave judgment in favor of the present appellants, which was reversed on an appeal to this court and a new trial ordered. 22 App. Div. 249, 47 N. Y. Supp. 743. A new trial has been had before another referee who has awarded judgment in favor of the respondent under a decision wherein he finds that the appellants should be charg-

ed with damages for the failure of the plant to perform the guaranty with regard to fuel consumption in the sum of $5,000; for damages for imperfect and improper construction of the plant $2,700; for the amount paid on account of the construction of the plant $2,000; or a total of $9,700, from which he deducts $5,600, instead of $5,621, for the contract price, and awards judgment in favor of the respondent for the balance, $4,100, besides costs. This judgment is brought here for review by the present appeal.

Argued before SMITH, P. J., and CHESTER, KELLOGG, COCHRANE, and SEWELL, JJ.

George N. Burt, for appellants.
W. L. Kiley, for respondent.

CHESTER, J. The second trial of this case was held six years after the appellants had surrendered the plant to the respondent. So far as the evidence shows, it never returned or offered to return it to the appellants. On the contrary, it has ever since kept and used it with knowledge of all its alleged defects. It undoubtedly had the legal right to do this, and to rely upon the express warranty contained in the contract for protection. Hooper v. Story, 155 N. Y. 171, 49 N. E. 773; Rust v. Eckler, 41 N. Y. 488; Day v. Poole, 52 N. Y. 416, 11 Am. Rep. 719; Fairbank Canning Co. v. Metzger, 118 N. Y. 260, 23 N. E. 372, 16 Am. St. Rep. 753; Brigg v. Hilton, 99 N. Y. 517, 3 N. E. 51, 52 Am. Rep. 63. An action having been brought for the purchase price, the damages for a breach of the warranty were a proper subject for counterclaim (Reab v. McAlister, 8 Wend. 109), and the damages for a breach of warranty is under the authorities the difference between the value of the plant if it had been as warranted and the actual value as it was at the time of delivery (Hooper v. Story, supra; Bates v. Fish Bros. Wagon Co., 50 App. Div. 38, 63 N. Y. Supp. 649; Isaacs v. Wanamaker, 189 N. Y. 122, 81 N. E. 763).

The referee has found that the appellants have not substantially performed their contract, and that they have been guilty of a breach of their guaranty as to fuel economy. He has allowed, as has been stated, $2,700 damages by reason of the improper construction of the plant; the items aggregating which amount being specified in his report in detail. It would seem that, if this amount was expended in correcting the improper construction, the plant would then conform to the requirements of the contract. In addition to this sum, the referee has found that at the time the plant was delivered to the light company it was worth $5,000 less than it would have been if it had been capable of performing the guaranty as to fuel consumption, and damages for this amount are also awarded. The $5,000 item is based apparently upon the testimony of Barrus, the light company's expert, and his testimony shows that he has included in his estimate of this amount of damages many of the same items going to make up the $2,700. This appears to be true as to the cost of a new stack, of resetting boilers, of putting in dampers, of new bases, of new piping, and of covering for pipes. There has thus been a repetition of many of the same items of damage. It cannot be correct in an action of this kind to allow a sufficient amount of damages to make a per-

_fect plant as called for by the contract, and at the same time award another amount as damages, because the plant is imperfect, when many of the same items are included in each amount.   In the testimony of this expert, where he gives the items making up the $5,-000 required for putting the plant into condition to fulfill the contract, he includes $500 for enlargement of the respondent's buildings.   On what theory the appellants can properly be made liable for this under the contract, we are unable to see.

Another item which is not only duplicated, but which we think was improperly included at all, is the one for a new stack.   When it was found that the 60-foot stack specified in the contract gave insufficient draft, the appellants erected a stack 100 feet high.   This was done at their own expense and by the knowledge and consent of the respondent.   The respondent claims that the enlarged stack increased the fuel consumption, was not in accordance with the contract, and not made of iron of sufficient weight.   The findings of the referee in this respect were, we think, against the weight of the evidence.   The first 60 feet was built, in exact conformity with the specifications, and, while the 40 feet was added without increasing the thickness of the 60 feet, the entire stack was standing and in good condition at the time of the second trial, six years after its erection.   Whitam, an expert called by the appellants, testified that "the increase in height of stack at this plant from 60 to 100 feet does not in the slightest impair the fuel economy of the plant."   Even Barrus, the respondent's expert, testified on cross-examination that "the effect of a high stack in increasing coal consumption can be controlled by regulating the damper, by regulating the draft," and in response to the question, "Cannot the effect of a 100-foot stack in increasing coal consumption be so far controlled by the dampers that it will not consume any more coal than a 60-foot stack to do the same work, other things being equal?" he answered:   "With proper care on the part of the fireman, the result would be the same in one case as the other.   The two stacks would give identically the same result."   We think, therefore, that the damages were improperly increased by allowing anything on account of the stack which, as the evidence shows, was added in good faith, with the respondent's consent, and without expense to it, to increase the efficiency of the plant.

The referee's report contains no finding as to what the plant was actually worth when put in.   The recovery is based on the finding that its value was less by the sum of $5,000 than it would have been had it been properly constructed in accordance with the contract, and had it been able to perform the guaranty in respect to fuel economy and on the finding of $2,700 damages for improper construction; the two sums, as has been stated, containing many duplicated items. The appellants under this judgment get nothing for all the labor performed and all the material furnished in constructing a plant which has been kept and used by the respondent for upwards of 10 years, and, in addition to this loss, they are burdened with a judgment for $4,100 damages besides over $2,000 costs.   The mere statement of these facts clearly indicates the injustice done to the appellants in the method of computing damages.

We think, too, that the learned referee has misconstrued the warranty. With the exception of the guaranty of the completed plant against defects in material for a period of one year, the warranty related wholly to the engine. Everything was covered by detailed specifications. In the pleadings of the respondent, and in its proof, the effort has been to show a breach of warranty that the engines would develop the rated horse power on a fuel consumption not exceeding three pounds of good anthracite coal per one horse power per hour actual running with variable load. The contract nowhere contains such an agreement. There is nothing said therein, and there is no finding to that effect. On the contrary, the guaranty as to fuel economy was that the engines would develop their rated horse power— i. e., 115 horse power each—on the fuel consumption named. To develop that amount of power, there must be furnished a load requiring approximately the same amount of power, not a variable load, which at one time would require the rated horse power and at another time much less than that. The proof is to the effect that the engines will not run with the same fuel economy at an under load as at the rated load, and when the test was made by the respondent's expert, a year after the delivery of the plant, according to his testimony, the load at no time during his test was sufficient to require the rated horse power of the engines to carry it, and, on the contrary, was only about one-half of that amount. The appellants under the agreement did not guarantee the fuel economy of the engines when carrying any less load than required to develop their rated horse power. For these reasons, there must be a new trial.

We think the motion to set aside the report of the referee for bias and prejudice against the appellants was properly denied, as there was no evidence to justify the granting of the motion.

The order denying such motion is affirmed, with $10 costs and disbursements and the judgment reversed, on the law and on the facts, the referee discharged, and a new trial granted, with costs to the appellants to abide the event. All concur.